UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| JEREMIAH YOUNG, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) 1:16-cv-00407-JCN |
| | ) |
| SGT. HARVEY, et al., | ) |
| | ) |
| Defendants | ) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

In this action, Plaintiff Jeremiah Young alleges Defendants Scott Harvey and Jordan Miller were deliberately indifferent to a substantial risk of serious harm to him when they failed to protect him from an assault by another inmate on July 5, 2016. Plaintiff asserts his claim pursuant to 42 U.S.C. § 1983.

Following a bench trial, and after consideration of the evidence[1] and the parties' arguments, the Court makes the following findings of fact and conclusions of law.

### Findings of Fact

The Court finds the following facts:

1. In June and July 2016, Plaintiff was an inmate at the Maine State Prison.

2. In June and July 2016, Lebon Bruno was also an inmate at the Maine State Prison.

---

[1] In addition to the testimony of witnesses and various documents, the evidence also included a disk that contained a video recording, which the parties agreed would not be played during the trial; the parties asked the Court to review the recording as part of its consideration of the evidence. The Court has reviewed the recording.

3. At all relevant times, Plaintiff was assigned to a cell in C-Pod of the Maine State Prison.

4. Sometime prior to July 1, 2016, Mr. Bruno was transferred from another pod to C-Pod. After approximately one week in C-Pod, Mr. Bruno was assigned to the same cell as Plaintiff.

5. Mr. Bruno was transferred to Plaintiff's cell as the result of a move slip that was purportedly signed by the inmates involved in the move, including Plaintiff. Plaintiff maintains that he did not sign the move slip.

6. Defendant Harvey, a sergeant assigned to work in C-Pod, was not at work on the day Mr. Bruno was transferred to Plaintiff's cell. Defendant Miller, a corrections officer assigned to C-Pod, was also not at work on the day Mr. Bruno was transferred to Plaintiff's cell.

7. At some point after Mr. Bruno was transferred into Plaintiff's cell, Plaintiff had concerns about and objected to Mr. Bruno's use of some type of liquid in the cell. When Plaintiff complained about Mr. Bruno's activity, Defendant Harvey addressed the issue.

8. On or about July 3, Plaintiff spoke with Defendant Harvey about Mr. Bruno and the move slip. Plaintiff explained that Mr. Bruno was acting erratically, that he had not signed the move slip, and that he did not want Mr. Bruno to remain as his roommate.

Although it appeared that Plaintiff might not have signed the move slip, Defendant Harvey was unable to determine whether the slip had been forged.

9. At the time Plaintiff requested that Mr. Bruno be transferred out of Plaintiff's cell, there was no cell to which Mr. Bruno could be transferred. Defendant Harvey asked Plaintiff to give him a few days to address the issue.

10. Under the policy of the Maine State Prison, if a prisoner expresses concern about the prisoner's safety due to a cellmate, the prisoner would be placed in emergency observation status, which includes a temporary placement in a single cell, while the matter is under investigation. When a prisoner is placed in emergency observation status, the prisoner is locked in and the prisoner's movement is restricted.

11. Plaintiff maintains he informed Defendants that Mr. Bruno threatened to harm him. According to Defendant Harvey, Plaintiff did not report a threat to his safety; instead, Plaintiff requested a move because he and Mr. Bruno did not get along. On July 4, 2016, Christopher Rocque, a corrections officer at the Maine State Prison, was present during a conversation involving Plaintiff and Defendant Harvey regarding Mr. Bruno. Mr. Rocque recounted that Plaintiff reported that he and Mr. Bruno were not getting along well, and asked if there was an empty cell to which he or Mr. Bruno could move, including an emergency observation status cell, but that Plaintiff did not want to be placed in emergency observation status because he did not want to have the emergency observation status restrictions imposed.

12. On July 5, 2016, after Plaintiff attended an education class, he returned to his cell. When he arrived in his cell, Plaintiff found a "yellow slip," which was a violation notice for a dirty room. This occurred as the inmates were starting to return to their cells for a scheduled lockdown for the prisoner "count."

13. At the time, Defendant Miller was nearby as he was preparing to conduct the "count." Plaintiff asked about the yellow slip, and Defendant Miller explained it was because of his roommate. Defendant Miller told Plaintiff that no action would be taken against Plaintiff because of the yellow slip.

14. Following the discussion with Defendant Miller, while Plaintiff was in the cell and Defendant Miller was still nearby, Mr. Bruno walked into the cell and referred to Plaintiff as a "rat." Defendant Miller heard Mr. Bruno refer to Plaintiff as a "rat" or something to that effect. Defendant Miller did not observe either Plaintiff or Mr. Bruno take any aggressive action toward the other. Although Plaintiff contends Mr. Bruno threatened him, Defendant Miller did not hear Mr. Bruno make any threats to Plaintiff.

15. Defendant Miller proceeded to assist with "count" of the prisoners. During the count, when the prisoners are in the cell, the cell door is locked and corrections officers move from cell to cell to conduct the "count." The prisoners were required to be in their cells during the "count."

16. After Defendant Miller confirmed that Plaintiff and Mr. Bruno were in their cell and the cell door was secure, Defendant Miller moved to the next cell. He had checked on two or three cells after Plaintiff's cell when he heard some commotion from the direction of Plaintiff's cell.

17. Defendant Miller returned to Plaintiff's cell, and observed that Plaintiff had Mr. Bruno pushed up against the wall.[2] Defendant Harvey arrived soon thereafter and told Plaintiff and Mr. Bruno to separate. By the time the cell was opened, Plaintiff and Mr. Bruno were separating. Plaintiff was removed from the cell.

18. In the days prior to the confrontation, other prisoners had complained to corrections officers about Mr. Bruno's erratic behavior. Mr. Bruno had been heard by prisoners and Defendant Miller to say something to the effect that he could beat up anyone in C-Pod. Defendant Miller did not hear Mr. Bruno make a specific threat to any individual.

19. During the confrontation, Plaintiff suffered some scratches on his head and face, an injury to his hand, and an injury to one or two of his fingers. He received treatment for his injuries at the medical unit of the prison.

20. Following the confrontation, Plaintiff was charged administratively with assault. During the administrative proceedings, Plaintiff was found not guilty of assault.

---

[2] Plaintiff contends that Mr. Bruno initiated the physical confrontation. At trial, Mr. Bruno testified that he threw the first punch. During his deposition, however, Mr. Bruno testified that he was "sucker-punched." Overall, Mr. Bruno's trial testimony was not credible.

**Conclusions of Law**

Plaintiff's claim arises out of the protections afforded inmates under the Eighth Amendment to the United States Constitution. The Cruel and Unusual Punishment Clause of the Eighth Amendment, as applied to the states through the Fourteenth Amendment, imposes a duty on prison officials to protect inmates from violence at the hands of other inmates. *Lakin v. Barnhart*, 758 F.3d 66, 70 (1st Cir. 2014). "That duty has its origins in the forced dependency of inmates[.]" *Giroux v. Somerset Cty.*, 178 F.3d 28, 31 (1st Cir. 1999). "Having incarcerated 'persons with demonstrated proclivities for antisocial criminal, and often violent, conduct,' having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Farmer v. Brennan*, 511 U.S. 825, 833 (1970) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526 (1984)).

Under the law, however, not every incident of prisoner-on-prisoner violence that results in injury gives rise to constitutional liability. *Lakin*, 758 F.3d at 70. To raise a genuine issue of constitutional liability, a plaintiff must demonstrate both that he/she was "incarcerated under conditions posing a substantial risk of serious harm," and that the defendant "acted, or failed to act, with 'deliberate indifference to inmate health or safety.'" *Id.* (quoting *Farmer*, 511 U.S. at 834). In other words, a plaintiff must satisfy both an objective standard (substantial risk of serious harm) and a subjective standard (deliberate indifference) in order to prove a claim of deliberate indifference. *Kosilek v. Spencer*, 774

F.3d 63, 82 (1st Cir. 2014) (en banc). "[A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847.

Preliminarily, the Court understands Plaintiff's frustration with his living situation in July 2016. The evidence suggests that another inmate forged Plaintiff's signature on a transfer form to facilitate Mr. Bruno's transfer to Plaintiff's cell. Plaintiff, and evidently other inmates in C-Pod, did not care for Mr. Bruno due to his erratic behavior. When Plaintiff asked Defendant Harvey to transfer Mr. Bruno, Defendant Harvey told Plaintiff he would work on it. When the transfer did not occur at the time of Plaintiff's request, Plaintiff was frustrated. The reasonableness of Plaintiff's frustration with any delay in the transfer of Mr. Bruno, however, does not govern Defendants' potential liability.

The central issue is whether Plaintiff has demonstrated by a preponderance of the evidence that Defendants were aware that Mr. Bruno posed a substantial risk of serious harm to Plaintiff prior to the confrontation between Mr. Bruno and Plaintiff on July 5, 2016. Plaintiff contends he satisfied his burden based on his report that he complained that Mr. Bruno threatened to harm him, and based on the fact that Defendant Miller heard Mr. Bruno refer to Plaintiff as a "rat" moments before the confrontation. Defendants, however, maintain that although Plaintiff asked for Mr. Bruno to be transferred to another cell, he never reported that he was concerned for his safety. Defendant Miller also contends that

7

although Mr. Bruno referred to Plaintiff as a "rat," he did not observe either Plaintiff or Mr. Bruno take any action to suggest that Plaintiff was at risk of serious harm, and did not hear Mr. Bruno make any threats to Plaintiff.

While the evidence established that Mr. Bruno's conduct in C-Pod was erratic, that Plaintiff did not want Mr. Bruno as a cellmate, and that Plaintiff asked Defendant Harvey to transfer Mr. Bruno out of Plaintiff's cell, the Court is not convinced that Defendants were aware that Mr. Bruno posed a substantial risk of serious harm to Plaintiff. Plaintiff's assertions that he told Defendants that he was concerned for his safety are disputed by Defendants and are not corroborated by any other reliable evidence. In fact, Corrections Officer Rocque's testimony that on the day before the confrontation he was present for a conversation involving Defendant Harvey and Plaintiff in which Plaintiff inquired about a move because he and Mr. Bruno were not getting along supports Defendants' contention.

Although Defendants were on notice that Plaintiff did not care for Mr. Bruno, that Plaintiff might not have requested or agreed to Mr. Bruno's transfer to Plaintiff's cell, and that Plaintiff requested that Mr. Bruno or Plaintiff be transferred to another cell, Defendants' knowledge of this information, without more, is insufficient to support a finding that Defendants were aware that Mr. Bruno posed a substantial risk of serious harm to Plaintiff. In addition, Mr. Bruno's reference to Plaintiff as a "rat" before the confrontation, with no physical aggression or other threatening behavior at the time, does not support such a finding. Plaintiff, therefore, has not established by a preponderance of

the evidence that, prior to the confrontation between Plaintiff and Mr. Bruno on July 5, 2016, Defendants were aware that Mr. Bruno posed a substantial risk of serious harm to Plaintiff.[3]

## Conclusion

Because on the Court's findings of fact and conclusions of law set forth herein, the Court orders that judgment shall be entered in favor of Defendants.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 23rd day of February, 2018.

---

[3] At trial, Plaintiff reiterated his belief that the Maine State Prison possessed video recordings of the July 5 confrontation between Plaintiff and Mr. Bruno. At the Court's request, counsel for Defendants consulted prison officials regarding the video recording policy and reported the results to the Court and Plaintiff. (ECF No. 82.) In essence, the prison does not maintain the recordings on a server for more than 30 days, although, presumably upon request within 30 days, the prison could save a recording to a DVD or another computer. Plaintiff contends that the prison should have maintained a recording of his cell on July 5 particularly because he filed a complaint about the incident within 30 days of the incident. (ECF No. 84.) He also questions, given the advances in technology, the reasonableness of the policy of overriding recordings within 30 days. While the Court understands Plaintiff's concerns about the prison's recording policy, there is no credible evidence to suggest that Defendants failed to produce in this case an available recording, or that any recordings are unavailable as the result of a deliberate attempt by Defendants to prevent the use of the recordings in this matter.